## TYLER. *v.* MOSES.

EQUITY JURISDICTION; SALE OF STOCK AND OPTIONS; FRAUD;
CONTRACTS; ELECTION OF REMEDIES.

1. Whether a suit is maintainable in equity to recover money paid
   for stock and stock options, through reliance upon the de-
   fendant's fraudulent representations, where the pleadings and
   proofs tend to show a partnership agreement between the par-
   ties respecting the options, and the probability of a multiplic-
   ity of suits if redress were sought at law, *quære.*
2. An objection, in such a case, that adequate remedy is to be had at
   law, comes too late when the bill has been answered without
   objection to the jurisdiction and testimony has been taken,
   and any remedy at law which might be claimed by the parties
   has been barred by lapse of time when the objection is made.
3. Whether one who seeks the rescission of a contract or a com-
   pleted sale, for fraud, is barred by *laches*, depends upon the
   particular circumstances of each case; and a liberal extension
   of the rule is allowable where the delay has not been willful or
   exercised for an unfair purpose.
4. Where the seller of stock and stock options delivers to the pur-
   chaser the guaranty of a third person to repurchase the stock
   at an advance within a certain time, and the purchaser notifies
   the guarantor of his intention to hold him liable on such guar-
   anty, but thereafter tenders the seller the guaranty before its
   maturity, and brings suit against the seller to rescind the sale
   and recover the money paid him upon the ground of fraudu-
   lent representations concerning the stock and options, the
   notification to the guarantor is not an election by the pur-
   chaser to affirm the purchase which will estop him in his pro-
   ceeding against the seller.·

No. 761.  Submitted October 4, 1898.  Decided November 8, 1898.

HEARING on an appeal by the defendant from a decree in
a suit to recover money paid for stock and stock options
through alleged fraudulent representations. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. A. S. Worthington* for the appellant:

1. As to the purchase by Moses from Tyler, trustee, of the

certificate No. 16 for 500 shares of stock in the Automatic Protector Company, Moses had a complete and adequate remedy at law, and there was therefore no jurisdiction in equity. The claim is that the defendant induced Moses to purchase it by misrepresentations, and a court of equity is asked to rescind the sale and to require the defendant to pay back to Moses the money which the latter paid for the stock. Such a suit can not be maintained in a court of the United States. *Insurance Co.* v. *Bailey,* 13 Wall. 616, 622; *Grand Chute* v. *Winger,* 15 Wall. 375; *Lewis* v. *Coks,* 23 Wall. 466; *Simmons* v. *Saul,* 138 U. S. 439, 460; *Scott* v. *Neely,* 140 U. S. 106; *Smythe* v. *Canal Co.,* 141 U. S. 656; *Drexel* v. *Berney,* 122 U. S. 241; Pomeroy's Eq. Jur., Vol. 1, Secs. 178, 296, 297; Vol. 2, Secs. 911, 914; Vol. 3, Sec. 1377; *Security Assn.* v. *Hutsell,* 31 U. S. App. 244; *Insurance Co.* v. *Stanchfield,* 1 Dillon, 424; *Andrews* v. *Solomon,* 1 Pet. C. C. 356; *Foster* v. *Swassey,* 2 Wood. & M. 217; *Whitehead* v. *Shattuck,* 138 U. S. 146; *Buzard* v. *Houston,* 119 U. S. 347.

2. In purchasing this certificate Moses relied upon Bryan's statements, and especially upon Bryan's guarantee, and not upon any representations made to him by Tyler.

3. Moses, by delay and his conduct after he had full knowledge of the alleged misrepresentations, has estopped himself from seeking to have the sale of the stock in question rescinded. If Moses ever had any right to have the sale of the stock to him rescinded, he lost that right, first, because he did not upon making discovery of the facts upon which he relies promptly notify Tyler that he rescinded the sale, and tender to Tyler both the certificate of stock and the guarantee; and, second, because, by acting as the owner of the guarantee and seeking to recover from Bryan the amount which by this guarantee Bryan had agreed to pay, he elected to ratify the sale long after he had been fully informed of the facts in the case. *Clements* v. *Smith,* 9 Gill, 156–160; *Hoopes* v. *Strasburger,* 37 Md. 390; *Masson* v. *Boost,* 1 Den. 69; *Hammond* v. *Pennock,* 61 N. Y. 153; *Sweet-*

*man* v. *Prince*, 26 N. Y. 227; *Hall* v. *Fullerton*, 69 Ill. 450; *Robb* v. *Vos*, 155 U. S. 13.

4. The evidence not only fails to establish that Moses was induced to purchase the stock by any misrepresentations on the part of Tyler, but demonstrates that Tyler told Moses nothing as an inducement to the purchase except what was true.

*Mr. J. J. Darlington* for the appellee:

1. Bills in equity to rescind contracts under precisely similar facts as those in the present case, have uniformly been held to lie in England, even where there were no other grounds of equitable jurisdiction. *Gillet* v. *Peppercorne*, 3 Beav. 77; *Clapham* v. *Shillito*, 7 Id. 146; *Oliver* v. *Court*, 8 Price, 127; *Rothchild's Case*, 3 Simmons, 153. A number of decisions of the Supreme Court of the United States are relied upon as denying to Federal courts of equity this jurisdiction possessed by their English prototypes. These decisions, however, read in the light of the facts to which they apply, are not applicable to the case at bar, and were not designed to deny the jurisdiction here claimed.

Adjudications of the Supreme Court of the United States specially upon the principle involved are to the effect that the provision of the sixteenth section of the Judiciary Act is merely declaratory, and does not tend to exclude equitable jurisdiction in the Federal courts, wherever that jurisdiction existed in England. *Roberts* v. *Campbell*, 3 Wheat. 222, 223; *Boyce* v. *Grundy*, 3 Pet. 215; *Jones* v. *Bowles*, 9 Wall. 369.

If we concede, however, the existence of the distinction between English equitable jurisdiction and that of the Federal courts which is claimed, that distinction can only apply to cases in which the remedy at law is "plain, adequate and complete." If the remedy in equity is more simple, tends to prevent multiplicity of suits, and is more plain, the jurisdiction, it must be conceded, is undoubted. In this

light, the objection disappears when the nature of the present case is considered.

2. It is freely conceded that a party to a contract, who, after discovery of the fraud and misrepresentations of which he complains, conceals his intentions from the other party to the contract, and takes or applies to his own use its fruits for any considerable period, does, as a general rule, waive his right to rescind. His failure or neglect to act, however must be such "as to induce a belief that it was his intention and purpose to waive. Voluntary choice is of the essence of waiver, and not mere negligence; though from such negligence, unexplained, such intention may be inferred." *Farlow* v. *Ellis*, 15 Gray, 229, 231, 232; *Clough* v. *Railroad Co.*, L. R. 7 Ex. 26; *Williamson* v. *Railroad Co.*, 28 N. J. Ex. 277, 291. No tender need be made, nor is the want of it available as defense, where the refusal of the adverse party was upon other grounds. *Wall* v. *Mitkiewicz*, 9 App. D. C. 109. Neither law nor equity requires meaningless forms. *Droop* v. *Ridenour*, 9 App. D. C. 95. Where a party has declared that he will not receive, the necessity of tender is dispensed with. *Newman* v. *Baker*, 10 App. D. C. 187. The practice of the court does not require a party to make a formal tender where, from the facts stated in the bill or from the evidence, it appears that the tender would be a mere form, and that the party to whom it was made would have refused to accept. *United States* v. *Lee*, 106 U. S. 81.

3. The conduct of Moses, relied upon as a ratification or estoppel, consisted simply in seeking payment of the guaranty from Bryan, after discovery of all the facts. This demand upon Bryan was made after Moses had tendered Tyler the stock and guaranty, and after Tyler had refused to accept the same or return the money. If he could have gotten his money in that way, he would have been spared the cost and expense of litigation. If he permitted the guaranty to be lost through failure to make such demand,

Tyler would doubtless be here objecting that this circumstance should deprive him of his remedy. There clearly was no intent to ratify, and no such act as, upon any legal or equitable principle, should be construed to be ratification. The very authority relied upon in the opposing brief upon this point, namely, *Robb* v. *Vos*, 155 U. S. 13, cites and approves at pages 42 and 43, *Butler* v. *Hildreth*, 5 Met. 47, to the effect that it would be going too far if plaintiff's mere demand of the price should be held a waiver of his right to avoid the sale and claim the goods; because, in many cases, if the price could be obtained it would be equally beneficial to the creditors, and he would have no further occasion to pursue the harsher remedy of impeaching the sale.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is a suit in equity for the recovery of certain sums of money alleged to have been paid through fraudulent misrepresentations, and the defendant has appealed from a decree of the Supreme Court of the District sustaining the bill.

The bill was filed by Arthur C. Moses and W. Woodville Flemming against Richard K. Tyler, and its substantial allegations are as follows:

(1) On June 8, 1893, defendant Tyler called upon Moses and told him that a friend of the defendant owned 1,000 shares of stock in the American Automatic Protector Company, a corporation capitalized at $100,000, and formed for the purpose of introducing automatic devices for the protection of telephones from lightning and the prevention of fires, etc.; that the company had several hundred devices in operation in Washington and Baltimore at good rentals.

(2) That the said friend, by reason of financial embarrassment, was compelled to sell, and that he (defendant) could purchase the stock for $2,000; that he desired to make the investment, but was able to command but $1,000, and wished said Moses to unite with him and furnish the remaining $1,000.

(3) That Moses, believing these statements to be true, paid defendant said sum of $1,000, who, upon the completion of payment about July 3, 1893, delivered to him a certificate for 500 shares of said stock that had been issued to R. K. Tyler, trustee, and was endorsed in blank by him.

(4) Shortly afterwards defendant again came to said Moses, representing that for the sum of $300 he could procure an option on 1,500 more shares running until October 31, 1893, and expressing his desire to have some third person of capacity and experience in the matter of promoting such enterprises to unite with Moses and himself; and inquired if Moses knew of such suitable associate.

(5) Moses introduced the complainant, Flemming, to defendant, who repeated to Flemming the statements formerly made to Moses, in respect of the number of devices then in use, and stated that he had invested $1,000 of his own money in the purchase of 500 shares of said stock, and $1,000 of Moses' money in like manner.

(6) That he had an option to purchase 1,500 additional shares at two dollars per share, good until October 31, 1893, and wished Moses and Flemming to unite with him; the said Flemming to pay $1,000 for 500 shares of the option stock, and he and Moses to pay each $100 as their *pro rata* contribution to the cost of said option; the remaining 1,000 shares of the option stock to be disposed of to the best advantage for their common profit.

(7) Relying upon the said representations, Moses and Flemming each contributed the sum of $100 to the price of the said option; and Flemming, through Moses, paid the further sum of $1,000 for the purchasing of said 500 shares of said option stock.

(8) Before the expiration of the option period, to wit, some time in October, 1893, Flemming discovered that the statements made to him by defendant were untrue, in that defendant had paid nothing for the option which he stated had cost him $300, and informed Moses that he should de-

cline to receive the stock which had not been, up to that time, tendered to him.

(9) The foregoing induced an investigation of all the facts in relation to the stock, and some time afterwards complainants learned that the 500 shares transferred by defendants to Moses for $1,000 were a part of 1,000 shares procured by the defendant himself, not from any financially embarrassed friend, as represented, but directly from the organizers or promoters of said corporation, and at an actual cost of $1,000 for the 1,000 shares, and that the stock proposed to be transferred to said Flemming was not a part of the stock covered by the said option upon 1,500 shares, but was the remainder of the stock that had been procured by the defendant at the rate of one dollar per share as aforesaid; and that the defendant had retained no stock at all in said company, he having had no other stock therein than the 1,000 shares aforesaid.

(10) Immediately upon discovery of these facts Flemming notified defendant that he would not accept any stock of said corporation, and demanded the return of the $1,000 paid on account of said purchase, and, also, the $100 obtained from him on account of the alleged cost of the said option. The said Moses also demanded the return of the $1,100 paid by him as aforesaid.

(11) About November 16, 1893, the defendant sent a certificate for 500 shares of stock to Moses for delivery to Flemming, who refused to receive the same and ordered it returned; and afterwards said Moses, acting for himself and Flemming, tendered to the defendant all of the said stock and demanded return of all the money so paid. The defendant refused to receive the stock or to repay the money.

(12) The bill concluded with the following paragraph:

"Your complainants are advised and believe and therefore aver that it was not competent for the defendant, representing himself as purchasing stock for the complainants and himself together for a common adventure and for their

equal benefit, to sell secretly his own shares of stock to the complainants, and especially at double the price which he himself paid for them, and that they are entitled in this honorable court to a decree requiring said defendant to return to them the moneys so received from them by him, with interest, they here offering to retransfer the said shares of stock upon which no dividends or profits have been received to said defendant."

The prayers were that defendant be decreed to repay to the complainants all the moneys so obtained; and for general relief.

2. The answer of the defendant Tyler gives the following account of the original acquisition of the stock:

"In the month of March, 1893, James B. Reynolds, of Boston, and myself paid Samuel L. Bryan the sum of one thousand dollars, each of us contributing five hundred dollars, in consideration whereof said Bryan delivered to me five hundred shares of stock in the American Automatic Protector Company in my own name and five hundred shares of stock in the same company in my name as trustee; also an option to purchase seven hundred and fifty shares of stock in said company, at two dollars per share, at any time within six months, and another option to purchase seven hundred and fifty shares, at two dollars per share, at any time within one year. At the same time and as a part of the consideration for the said sum of one thousand dollars said Bryan gave to me an agreement in writing signed by said Bryan by which he agreed that on the first day of April, 1894, he would purchase back from me five hundred shares of said stock, delivered as aforesaid to me, at an advance of ten per cent. on the one thousand dollars paid him, provided three days' notice should be given him. Not long afterwards said Bryan gave me, at my request, in lieu of said guarantee, another, in substantially the same form, except that it did not contain my name, but was a general agreement on his part to repurchase five hundred shares of said stock on said

terms. Said certificate for five hundred shares in my name as trustee I held for the benefit of said Reynolds; the other certificate for five hundred shares belonged to me. Said options and said guarantee I held for the joint benefit of said Reynolds and myself. Said guarantee was made to repurchase five hundred shares instead of one thousand, at the instance of Bryan.

"In the month of June, 1893, I did offer to sell five hundred shares of said stock to the complainant, Arthur C. Moses. I did not tell him that a friend of mine was the owner of one thousand shares of said stock. At the same time I informed him of said guarantee, telling him that if he should purchase five hundred shares of said stock I would transfer the guarantee to him."

He further says that Moses was referred to and called upon Bryan as to the value of the stock, and relied on Bryan's statements. He denies each and every allegation of fraudulent representations to either Moses or Flemming, and admits the receipt of the money alleged to have been paid by them. He admits telling Moses that he had a financially embarrassed friend who wanted to sell his stock; Reynolds was the friend; but he did not tell Moses who the friend was. He denies telling him that he could procure 1,000 shares from this friend for $2,000, or that he was acting solely on behalf of his friend. He denies telling Moses that he desired to make the investment himself, or that he wanted him (Moses) to join him in the same, and charges that he sold him the stock without any suggestion that in buying he was entering into a joint arrangement. He avers that Moses suggested to him a sale to Flemming; and denies that he told Flemming that he had invested $1,000 of his own money in the purchase of 500 shares of stock. He says: "I did tell him I was to pay $300 for said options; and in fact I did pay said. Reynolds $300 for his interest alone in said options."

He then refers to the negotiations which followed with Flemming, and says:

"During that interview and in pursuance of an understanding between Moses and myself and in the presence and hearing of said Moses I told said Flemming that he could purchase one-third of an option on one thousand shares of said stock for one hundred dollars and could purchase outright five hundred shares of stock for one thousand dollars. I told said Flemming that he could see said Bryan, but that I thought advisable that he should not, as I was to get the option of selling certain territory, and if both he and Moses went to Bryan so soon he might ask more for the options and the territory I was after, to which said Flemming assented and the conversation closed by said Flemming saying that he would look into the matter. It is true that shortly afterwards said Moses and said Flemming each paid to me one hundred dollars. At or about the time of such payment I signed and delivered to said Moses a paper by which I assigned to said Moses and to said Flemming each a one-third interest in said six months' option and in two hundred and fifty of the seven hundred and fifty shares represented by the one-year option, reserving to myself the remaining five hundred shares included in the one-year option. In and by the same paper I agreed that upon the payment to me by said Flemming of the further sum of one thousand dollars, I would transfer to him absolutely five hundred shares of stock in said American Automatic Protector Company. Said Moses was said Flemming's agent in carrying out this arrangement and he knew that the five hundred shares of stock thus agreed to be sold to said Flemming were the five hundred shares received by me from said Bryan, as aforesaid, and represented by a certificate issued to me in my own name, and not as trustee.

"Another paper was signed about the same time by said Moses and myself, by which we agreed to hold all our stock

in said company and to sell only by mutual consent and to divide the profits equally between us three—Moses, Flemming, and myself. Said Flemming did not sign said paper and so far as I know was not asked to sign it. Upon information and belief I aver that both said papers are now in the possession or control of said Moses. When said last-mentioned paper was prepared by said Moses it purported to bind us to divide profits and losses equally, but I objected to any agreement to divide losses and thereupon the words 'and losses' were struck out before the paper was signed."

3. It appears, without dispute, that S. M. Bryan, who was the president of the Telephone Company in Washington, was also president of the Automatic Protector Company, which owned the device for arresting lightning and dangerous currents of electricity that might come in contact with telephone wires; and that he came to R. W. Tyler, the father of defendant, who was also president of the Washington Board of Underwriters, with a view to interest him in the stock of the corporation. R. W. Tyler went with the defendant to see Bryan, who discussed the advantages of the device and the prospective profits to be made by the corporation owning it. Subsequently, defendant paid Bryan $1,000, and received from him two certificates for 500 shares each, one of which was in his name as trustee. This is the certificate subsequently transferred to Moses.

Bryan also gave him a written promise that upon demand twelve months thereafter, he would repurchase the 500 shares for $1,100. This was the 28th day of March, 1893. At the same time Bryan executed and delivered to defendant, two agreements, in one of which he agreed to transfer to R. K. Tyler, trustee, 750 shares of the stock at any time within one year upon the payment of $1,500; and in the other, to transfer to R. K. Tyler 750 shares on or before October 31, 1893, upon the payment of a like sum. It was the expectation of Tyler, Moses and Flemming that they would also

deal in the sale of rights to use the patented device of the corporation.  Tyler visited Boston for the purpose and to aid him therein the $1,000 paid by Flemming was sent to him at that point.  The Boston negotiation failed.

Bryan was not informed by defendant that his friend Reynolds was jointly interested with him in the transaction, or had any connection with him.

4. All of the parties testified in the cause, as did S. M. Bryan and R. W. Tyler.  Bryan says that the negotiation was between him and R. W. Tyler; that he offered R. W. Tyler 500 shares for $1,000, with the guarantee to repurchase same for $1,100, on or after April 3, 1894; and 500 additional shares, with the option contracts for 1,500 more shares, as a gift; that R. W. Tyler instructed him to issue the first certificate for 500 shares to R. K. Tyler individually, and the second to him as "trustee;" that he conformed to this request without asking the reason therefor; that his object in all this was to interest R. W. Tyler, because of his position; and that he regarded him as the real party, and his son, the defendant, as his representative merely.

Defendant testified that he overheard part of the conversation between Bryan and his father, and upon the latter's declining to engage in it, he himself took it up because he thought the investment a good one.  R. W. Tyler said that Bryan came to him and explained the device, and afterwards proposed the investment in the stock.  At his son's request he went with him to see Bryan about the matter. What occurred at that interview was stated by him as follows:

"He was to sell a certain amount of the stock at a certain figure, I think, which I would not undertake to quote, and to give me some stock if I would go into it.  He seemed anxious to have the Board of Underwriters of the District adopt this device, with a view of getting it into general use and of having them require it, and where it was used to give

'a reduction of rate on the insurance, and in cases where it was not used to charge the full rate. I was at that time president of the Association of Underwriters.

"Q. You mean in Washington? A. In Washington, for the District of Columbia; yes, sir. I told him I did not think it would do for me to be interested in the stock for that reason, but that I thought I could probably be of more service to him by not holding the stock; that I was in favor of his scheme, believed it was a good thing, and was in favor of adopting it. I told him it would be necessary to get the co-operation of the executive committee, and that he had better devote his energies to that committee or to other members of the association; that I thought well of this device, and should do all I could to have it adopted; that is about all that occurred about his offer. On leaving there I told him that I did not think I would go into this enterprise, but that I thought very likely my son might, and that if I concluded to have anything further to do with it I would let him know. I think that was the last of it. I do not think I went back to see him any further about it."

The defendant testified that his friend Reynolds furnished $500 of the $1,000 paid to Bryan, and was secretly interested with him, and that of the $2,200 received from Moses and Flemming he accounted to Reynolds for $1,300, paying him $800 in money and $500 in the stock of a land company in Baltimore. Reynolds corroborates him in this.

No testimony was given in regard to the condition of the Automatic Protector Company, and the case has proceeded upon the assumption of its failure.

5. Upon the whole of the evidence the learned justice who presided at the hearing was of the opinion that the substantial charges of the bill had been sustained, and decreed accordingly; and we do not find anything in it, after careful consideration, sufficient to justify us in reversing his conclusion.

There was ·much conflict upon material points, which is sufficiently indicated in the statement of the case hereinabove made in order to present the issues of law and fact that are involved in the decision; and we do not see how any useful purpose would be served by an extended review of the evidence.

We think it sufficient, therefore, to say, in support of the conclusion of the trial justice and of our adoption thereof, that, granting the confusion that exists in some of the statements· of the complainants, and the want of precision on some important points, there is, nevertheless, so much weight in the surrounding and undisputed circumstances, that we can not believe the complainants would have purchased the stock and the options had they known or suspected that the defendant, instead of joining them in the investment, was in fact selling out, or, in the language of such transactions, "unloading" his stock upon them.

In view of Bryan's well-known solvency, and the supposed binding effect of his contract to repurchase 500 shares of the stock at the end of twelve months, for the sum of $1,100, Moses, it is quite true, might have been supposed indifferent as regards defendant's remaining in the enterprise; but his purchase of the interest in the options can not be accounted for in that way. That purchase and the solicitation of the co-operation of Flemming (whether of his own · motion or at the suggestion of defendant, is of no consequence), show his confidence in the investment and his belief in the continued interest of the defendant. It is evident, too, that he relied on the fact that defendant's father was president of the local underwriters' association, and might exert his influence towards securing a general adoption of the devices. ·Defendant corroborates him to this extent, though he denies that his father had any interest in the investment, for he said: "I told him (Moses) that I thought my father thought this device was good, and that ·

the board would adopt it for use on telephones, and on that account there would be a great many more brought into use and there would be large profits."

It is not perfectly clear, but seems fairly well established, that Flemming thought he was buying 500 shares embraced in the options, and not 500 shares already held by the defendant. Unquestionably he relied upon Tyler's certain and continuing interest. Tyler shows this in his answer, where he states the contents of the agreement between Moses, Flemming and himself. Whether the word "losses" remained unstricken from that paper, as the others contend, is of no special importance as regards this point.

6. The question of the greatest difficulty in this case is in the objection to the jurisdiction of equity, on the ground that the remedy at law was plain, adequate and complete. If the question turned merely upon the right of either Moses or Flemming to recover the money paid to defendant through reliance upon his fraudulent misrepresentations and concealments, uncomplicated by the partnership agreement in respect of the purchase and holding of the option stock, there would be no doubt that the action is one of which a court of equity ought not to have taken jurisdiction. Where a judgment for pecuniary damages would answer all the claims of the parties, and is the only redress which the plaintiff seeks or could have, the remedy at law is exclusive. *Buzard* v. *Houston*, 119 U. S. 347, and other cases cited by the counsel for the appellant.

But whether the allegations and proof in respect of the partnership agreement, and the probable multiplicity of suits that might be occasioned if redress were sought at law, are sufficient to make a reasonably clear case of concurrent jurisdiction in equity, we do not consider it necessary now to decide.

The case is one, in its general features, of a class over which equity originally had and exercised a jurisdiction that is now denied in a particular case only because the

remedy at law has become adequate and complete. The bill was filed May 29, 1894, in apparent good faith, and contains no specious allegation for the purpose of giving jurisdiction. The defendant answered without objection to the jurisdiction, and much testimony was taken before the final hearing was had on November 19, 1897. Any remedy which the parties might now claim at law has become barred by lapse of time. Under such circumstances, we think the objection comes too late. *Reynes* v. *Dumont*, 130 U. S. 354, 395. In that case it was said by the Chief Justice that: "The rule as stated in 1 Daniell's Chancery Practice, 555, (4th Am. Ed.), is that if the objection of want of jurisdiction in equity is not taken in proper time, namely, before the defendant enters into his defense at large, the court having the general jurisdiction will exercise it; and in a note on page 550, many cases are cited to establish that, 'if a defendant in a suit in equity answers and submits to the jurisdiction of the court, it is too late for him to object that the plaintiff has a plain and adequate remedy at law. This objection should be taken at the earliest opportunity. The above rule must be taken with the qualification, that it is competent for the court to grant the relief sought, and that it has jurisdiction of the subject-matter.'" See, also, *Kilbourn* v. *Sunderland*, 130 U. S. 505, 514; *Tyler* v. *Savage*, 143 U. S. 79, 97; *Hollins* v. *Brierfield Coal and Iron Co.*, 150 U. S. 371, 381.

What has been said is sufficient, also, to dispose of the point made on the misjoinder of complainants.

It may be remarked in this connection that we were informed on the argument there had been a settlement of the matters involved in the appeal between the appellant and Flemming, which accounts for the fact that the argument on behalf the appellant has been chiefly directed to the particular case of Moses. This settlement is not embraced in the record.

7. The last proposition on behalf the appellant that re-

mains to be considered is, that "Moses, by delay, and his conduct after he had full knowledge of the alleged misrepresentations, has estopped himself from seeking to have the sale of the stock in question rescinded."

It appears by the letter from Flemming to Moses on November 16, 1893, that he suspected the perpetration of the alleged fraud. Inquiries of the defendant and further investigation followed. Demand was made for the return of the money paid for the stock, the precise date of which does not appear.

Flemming refused to receive the certificate of stock that was sent to him.

The evidence shows that, after the failure of negotiations for a settlement with Flemming, Moses announced his complete repudiation of the purchase, and that defendant, at the same time, declared his intention not to accede to the demand. Whether Moses made, or failed to make, a complete tender of the stock and guaranty to the defendant at or about the same time, is immaterial. Moses knew that defendant would not receive it, and defendant knew that Moses was ready and willing to deliver it at any time that he himself might indicate a change of intention.

No one questions the reasonable rule of equity, that one seeking the rescission of a contract or a completed sale, for fraud, must act promptly, *i. e.,* within a reasonable time after discovery; but constant difficulty lies in the ascertainment of this reasonable time. Necessarily there can be no fixed or determined number of days, weeks or months applied, like a statute of limitations, to all cases of the same general character; hence it follows that the period within which decisive action must be taken varies in length according to the special circumstances of each particular case; expanding or contracting as justice, administered with due regard to the observance of the general rule of diligence, may reasonably demand.

Peculiar conditions sometimes demand immediate action, brooking no delay beyond a reasonable time for consideration of, and determination upon, the line of action to be taken. Others, again, permit a liberal extension of time where the delay has not been willful or exercised for an unfair purpose. The conditions of this case, in our opinion, justify a liberal application of the rule.

As we have seen, the defendant knew that Moses claimed the return of his money. He, in return, had declared his intention not to comply with the demand under any circumstances. It is not claimed that he might have saved anything on the stock had its return been more promptly tendered, provided even that he would have accepted it. His position was not injuriously affected, in even the slightest degree; nor has the right of any third person intervened or been put in jeopardy.

But it is said that Moses' conduct in notifying Bryan of his intention to demand performance of the guaranty, was the exercise of an election to affirm the purchase of the stock, from which he is estopped to withdraw. In this view, also, we are unable to concur.

The time for the performance of that guaranty had not arrived. Had Bryan recognized his obligation to pay Moses the $1,100, that might, indeed, have ended the matter. Moses would have been saved the expense and annoyance of litigation. Defendant would have been a decided gainer; nor has he lost anything by Bryan's declination to recognize either a legal or moral obligation. The guaranty was at all times available to the defendant, and it was specifically tendered to him before its maturity. Moses did not undertake to enforce it by suit.

As a matter of fact, the instrument seems to have been regarded by all concerned as of no legal obligation, because of the failure to name any person therein as obligee. Be that as it may, the defendant had every opportunity to avail

himself of the instrument if he had been so inclined, and neither he nor any one else sustained, or could have sustained, any injury through the conduct of Moses.

We do not think, therefore, that Moses' action in respect of the guaranty can be regarded as such an election between inconsistent rights or remedies as would preclude his right to disaffirm the contract and recover the money paid thereon, under the rule recognized in *Robb* v. *Vos*, 155 U. S. 13, 39, and other cases relied upon by the appellant. On the contrary, his mere demand of performance by Bryan, in the hope that his money might possibly be realized in that way, brings his case within the exception to the rule laid down in *Butler* v. *Hildreth*, 5 Metc. 49, and quoted with approval in *Robb* v. *Vos, supra*: "It would, we think, be going too far to say that merely demand of the price would be deemed a waiver of his right to avoid the sale and claim the goods; because, in many cases, if the price could be obtained, it would be equally beneficial to the creditors, and he would have no further occasion to pursue the harsher remedy of impeaching the sale."

Believing that the decree was rightly rendered, it will be *affirmed, with costs.*